FILED
13th JUDICIAL DISTRICT COURT
Cibola County
1/8/2020 2:31 PM
Toinette Garcia
CLERK OF THE COURT
Chase Taylor

**STATE OF NEW MEXICO**
**COUNTY OF CIBOLA**
**THIRTEENTH JUDICIAL DISTRICT COURT**

**RUEBEN OLVEDA, on his own behalf**
**and as Next Friend of M.O., a child;**
**JOELEEN ROMERO, on her own behalf and as**
**Next Friend of A.R., a child; GEORGE OLVEDA,**
**DAVID OLVEDA, WAYNE ERICE, BRIAN ERICE,**
**SAMANTHA CHAVEZ, DOMINIQUE LUNA,**
**SAMPSON BLEA, as Next Friend of V.B., a child;**
**and MIKE TURRIETA, as Next Friend of I.C. and A.C.,**
**children,**

       **Plaintiffs,**

                                            **Case No.  D-1333-CV-2018-00350**

**v.**

**CIBOLA COUNTY BOARD OF COMMISSIONERS,**
**SHERIFF TONY MACE and UNDERSHERIFF**
**MICHAEL MUNK,**

       **Defendants.**

## AMENDED COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

> Outfitting police in "hooded combat fatigues, arming them with
> laser-sighted weapons and ordering them to conduct the 'dynamic
> entry' of a private home does not exempt their conduct from Fourth
> Amendment standards of reasonableness …. At all times, SWAT
> officers no less than others—dressed in camouflage or not—must
> keep it clearly in mind that we are *not* at war with our own people."[1]

For days, law enforcement officers from a half-dozen agencies cast a dragnet across the

City of Grants, New Mexico, in search of an individual who had escaped from jail. In the course

of the manhunt, deputies from the Cibola County Sheriff's Office ("CCSO") accompanied the

New Mexico State Police's Tactical Team in their Ballistic Engineered Armored Response

Counterattack Truck ("Bearcat") on a warrantless house-to-house search for the escapee. Without

probable cause or a warrant, the arsenal eventually arrived at Plaintiff Rueben Olveda's front door.

---

[1] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1194-95 (10th Cir. 2001).

There, the Cibola County Undersheriff, Sheriff's deputies and state police agents interrupted Rueben's birthday barbecue and used a bullhorn to order his entire extended family, including five children, outside at gunpoint, where they were searched, handcuffed, and locked in the backs of hot police cars with the windows rolled up in the middle of July for around an hour. The family had no connection whatsoever to the escapee, and the officers' militarized-aggression needlessly caused lifechanging trauma to all children.

During the course of the raid, a Sheriff's lieutenant and other officers ran Rueben's family members' information through the National Crime Information Center ("NCIC"), checked them for warrants, turned over mattresses and searched silverware drawers in Rueben's home, questioned one child about her citizenship, and threatened to call the New Mexico Children, Youth, & Families Department to report a child's mother for no apparent reason. However, they made almost no investigation directed at locating the escapee who was supposedly the target of their search. The Sheriff later failed to produce records responsive to a public records request related to the incident and falsely denied that any deputies were even involved in the raid at all. Because Defendants' conduct is abhorrent to the Constitutions of the United States and the State of New Mexico, Plaintiffs, through counsel, bring the following Complaint.

## JURISDICTION AND VENUE

This Court has jurisdiction over this action and venue is proper in this district. Plaintiffs provided notice of this incident to the CCSO in accordance with the New Mexico Tort Claims Act.

## PARTIES

1. Plaintiff Rueben Olveda is a New Mexico resident. He brings these allegations on his own behalf and as Next Friend of his daughter, M.O., a baby. He owns the home at #9 East Roosevelt in Valencia Village, Grants, New Mexico.

Exhibit A

2.      Plaintiff Joeleen Romero ("Joeleen") is a New Mexico resident. She brings these allegations on her own behalf and as Next Friend of her daughter, A.R., age nine. Joeleen is also Rueben's mother. She and A.R. were guests at Rueben's home on the date of the incident.

3.      Plaintiff George Olveda ("George") is a New Mexico Resident. He is Rueben's father and was a guest at Rueben's home on the date of the incident.

4.      Plaintiff David Olveda ("David") is a New Mexico Resident. He is Rueben's cousin and was a guest at Rueben's home on the date of the incident.

5.      Plaintiff Wayne Erice ("Wayne") is a New Mexico Resident. He is Rueben's stepfather and was a guest at Rueben's home on the date of the incident.

6.      Plaintiff Brian Erice ("Brian") is a New Mexico Resident. He is Rueben's stepbrother and was a guest at Rueben's home on the date of the incident.

7.      Plaintiff Samantha Chavez ("Samantha") is a New Mexico Resident. She is Rueben's girlfriend and she lives with him but was gone when the raid began. She drove up to the scene in the middle of the raid and was detained and questioned.

8.      Plaintiff Dominique Luna ("Dominique") is a New Mexico resident. She is Rueben's cousin and was a guest at Rueben's home on the date of the incident.

9.      Plaintiff Sampson Blea is a New Mexico resident. He brings these allegations as Next Friend of his daughter, V.B., age thirteen. V.B. is Rueben's cousin and was a guest at Rueben's home on the date of the incident.

10.     Plaintiff Mike Turrieta is a New Mexico resident. He brings these allegations as Next Friend of his children, I.C., age thirteen, and A.C., age eleven. I.C. and A.C. are Samantha's little brother and sister and were guests at Rueben's home on the date of the incident.

11.     The Cibola County Board of Commissioners is the entity subject to this lawsuit pursuant to NMSA 1978, Section 4-46-1 (2014). The Board is vicariously liable for the acts or omissions of law enforcement officers employed by CCSO pursuant to the New Mexico Tort Claims Act.

12.     Sheriff Tony Mace ("Sheriff Mace") is the Sheriff of CCSO and acted as the office's custodian of public records in response to Plaintiffs' written request for inspection of public records dated June 21, 2017. Sheriff Mace is a law enforcement officer within the meaning of the New Mexico Tort Claims Act. He is also sued in his official capacity pursuant to NMSA 1978, Sections 14-2-11 and -12.

13.     Undersheriff Michael Munk ("Undersheriff Munk") is the second-highest ranking officer at CCSO and was the County's highest-ranking officer on scene during the raid of Rueben's home. As the highest-ranking executive law enforcement officer on scene from the County, Undersheriff Munk was the alter-ego of the Sheriff, authorized by statute to discharge all duties that belong to the office of the Sheriff. Undersheriff Munk is also the officer responsible for determining when to deploy the County's SWAT Unit. He is the policymaker for Cibola County on the creation of the SWAT Unit, on creation of policies and procedures for the SWAT Unit and on when it is appropriate to deploy the SWAT Unit in Cibola County. Undersheriff Munk is a law enforcement officer within the meaning of the New Mexico Tort Claims Act. He is also sued in his individual capacity pursuant to 42 U.S.C. § 1983. At all relevant times, he acted within the scope of his duties and under color of state law.

## FACTUAL ALLEGATIONS

### *The Dragnet for Ramon Lorenzo*

14.     On June 13, 2017, at around 9:00 p.m., Ramon Lorenzo escaped from the Cibola County Detention Center.

15.     Sheriff Mace initiated a manhunt across Grants, New Mexico, and neighboring communities, staffed by several agencies including CCSO, the New Mexico State Police Investigations and Uniform Bureaus, the Grants Police Department, the Milan Police Department, the Department of Corrections, Adult Probation and Parole, the Western New Mexico Correctional Facility, the Northwestern Correctional Facility CERT team, and the Bernalillo County Sheriff's Office air support division.

16.     The manhunt was a model of unconstitutional conduct.

17.     Personnel from various agencies initially surrounded the Mount Taylor Subdivision and conducted a middle of the night street-by-street search within.

18.     Officers were instructed to make warrantless stops and searches of all cars entering or leaving the subdivision.

19.     State Police Agents began conducting drone flights over the area.

20.     By the early morning hours of June 14, 2017, law enforcement had received numerous tips about Mr. Lorenzo's location.

21.     Undersheriff Munk began directing teams to specific residences to search homes.

22.     Heavily armed officers knocked on doors throughout the night and into the morning, questioning occupants and demanding consent to search residences.

23.     State Police Sergeant Hugo Munoz activated the State Police Tactical Team, staffed by, among others, Joseph Chavez, Shayne Beckford, Anthony Macias, Jose Urbano, Joshua Silva, Armando Reyesllamas, and Lawrence Maggard.

24.     Tact Team officers armed themselves with assault rifles, donned camouflage military gear, and began driving around Grants in a Lenco Bearcat, which is advertised as a military-grade

Exhibit A

armored truck designed to meet HAZMAT and counterterrorism needs for close quarter battle engagements.

25.    Tact Team officers cooperated with CCSO deputies to detain people and search their homes.

26.    Officers followed orders from a unified joint command between New Mexico State Police and the CCSO. Both agencies worked together toward a common purpose.

27.    Cibola County Sheriff's deputies and state police specialized units, including the Tact Team, operated as a multi-jurisdictional team.

28.    Sheriff Mace is the chief executive law enforcement officer in Cibola County, with jurisdiction over all cases arising in the County. Officers from other agencies—whether municipal, state, or federal—cannot effect an arrest within Cibola County without first being "cross-commissioned" by Sheriff Mace.

29.    Officers decided that the best strategy was to "put pressure on people or on the community," to get them to "start talking."

30.    Officers used the Bearcat's intercom system to order people out of their homes and detain them for questioning, sometimes at gunpoint.

31.    Officers began receiving tip after tip about Mr. Lorenzo's possible location.

32.    On a tip, officers began searching all units at the Lobo Canyon Apartments and harassing residents there, some of whom had their apartments searched multiple times throughout the day by various law enforcement agencies.

33.    A confidential informant reportedly told CCSO Deputy Kemp that he had information about Mr. Lorenzo.

34.     NMSP Agents Wayne Harvey ("Agent Harvey") and Tony DeTavis ("Agent DeTavis") spoke with the informant and learned that it was possible Mr. Lorenzo would be located in the Valencia Village Subdivision, at either 1400 East Roosevelt, Ave., Space #2, or Space #24.

35.     At or around 2:00 p.m., Deputy Kemp and Agents Harvey and DeTavis met a Milan Police Officer and several CCSO deputies at Valencia Village, including members of CCSO's Special Services Unit ("SSU"), which is a County SWAT team. At the instruction of Sheriff Mace, Undersheriff Munk accompanied Deputy Kemp, who was also SSU, and the other officers to Valencia Village.

36.     SSU, which was created in 2015 by Undersheriff Munk, displays the following combat insignia on the cover of its standard operating procedures:



37.     SSU, a specialized combat unit, is trained to work with other agencies, including the state police in the apprehension of "HARD CORE GANG MEMBERS" in Cibola County. SSU personnel are authorized by Undersheriff Munk to wear tactical uniforms and carry personal firearms, urban rifles, 4X scopes, and sawed-off shotguns.

38.     Together, Deputy Kemp, the other SSU officers, and Agents Harvey and DeTavis made contact with residents at #24 and searched the home without locating Mr. Lorenzo. Deputy Kemp was armed with an AR-15.

39.     While waiting outside at #24, Deputy Kemp saw an individual at #33 behaving "suspiciously".

40.     Deputy Kemp and the other officers made contact with individuals at #33 and searched the home without locating Mr. Lorenzo.

41.     Meanwhile, other officers began arriving in Valencia Village.

42.     Regional Dispatch requested all Grants Police Department units to assist.

43.     Officer Moses Marquez, K9 Officer Julian Armijo ("Officer Armijo"), and Detective Corporal White of the Grants Police Department all responded to the scene.

44.     Corrections officers from the detention center arrived and secured the perimeter, peering over the walls into the mobile home park.

45.     Marcus Lopez of the State Police completed an interview with one of Mr. Lorenzo's ex-girlfriends and traveled to Valencia Village.

46.     CCSO Special Deputies Richard Buhite ("Special Deputy Buhite") and Ralph Sabroe ("Special Deputy Sabroe") joined Adult Probation and Parole Officers and two State Police agents knocking on doors in the subdivision.

47.     Sheriff Mace personally dispatched CCSO Sheriff's Lieutenant Harry Hall and Detective Stephen Chavez to Valencia Village to assist with searches of homes.

48.     Finally, the Tact Team officers traveled to Valencia Village, driving the Bearcat.

Exhibit A

49.     While all officers from all agencies on scene acted in concert in the search for Mr. Lorenzo, only CCSO, under the direction of Sheriff Mace and Undersheriff Munk, had the authority to take command of the investigation.

### *The Invasion of Rueben's home*

50.     After unsuccessfully searching the homes at #24 and #33, CCSO deputies met up at the cul-de-sac at the entrance of Valencia Village where the homes at #1 and #2 were situated.

51.     Each cul-de-sac in Valencia Village contains eighteen plots.

52.     The cul-de-sac that contains spaces #1 through #18 has five vacant plots.

53.     The remaining thirteen plots have homes on the land.

54.     Deputies searched #1.

55.     Deputies then traveled to #2, reportedly based on information provided by their confidential source.

56.     A deputy used the butt of his rifle to shatter a window at #2 and another officer pointed his rifle inside.

57.     The resident at #2 eventually came outside under duress and got on his knees in the street.

58.     Officers from other agencies on scene were surprised by CCSO's aggression.

59.     "Dude, those [Sheriff's Office] guys threw the fuck out of those houses, dude. … No, I'm fucking serious dude … Bro I'm telling you[,]" one State Police Agent told another.

60.     While CCSO deputies were unsuccessfully searching #2, other deputies began asking neighbors "who the troublemakers are."

61.     The mobile home park manager told deputies that the occupant at #8 was a troublemaker or a "bad apple."

62.     CCSO deputies, including Deputy Kemp, approached #8, drew their weapons and "held on the residence."

63.     The Tact Team officers arrived, saw CCSO deputies holding on #8, and drove the Bearcat to #8 to provide cover.

64.     While deputies prepared to make contact with residents at #8, Deputy Kemp reportedly noticed "all kinds of movement" in #9. Deputy Kemp advised Undersheriff Munk that there was a male subject looking in and out of #9 and movement in #9.

65.     The Tact Team positioned the Bearcat in front of #9.

66.     CCSO deputies had no information suggesting that criminal activity was afoot at #9.

67.     In his deposition, Undersheriff Munk later testified that it was a "fast situation between 8 and 9," meaning that "there was movement at 8" and "[t]here was movement at 9."

68.     Undersheriff Munk personally saw movement at Nos. 8 and 9, but nothing unusual, though he later testified that "the subject could possibly have been in Number 8."

69.     He testified that: "As I recall, somebody, some of the neighbors or people that were standing around or were in the area were saying something about Number 9. And … the original resident at Number 1 said 8, and then pointed over towards Number 9," which was situated side-by-side with #8.

70.     CCSO deputies and Tact Team officers made a conscious decision to "take both 8 and 9" by force and "deal with it as [they] go."

71.     One officer on scene called the decision to search #9 a "wild goose chase."

72.     Another officer said that they would just have to go "from house to house until [they] find [Mr. Lorenzo]."

73.     All officers were under orders to "shake the tree and see what falls out."

74.  The Tact Team officers repositioned the Bearcat in front of #9.

75.  Agent Urbano manned the Bearcat's intercom system and began ordering residents at #9 to exit the home with their hands up. At some point, a neighbor photographed the Bearcat through his blinds:



76.  Undersheriff Munk issued "verbal commands" into the residence for occupants to come outside.

77.  The Tact Team officers and CCSO deputies, including SSU and including Deputy Kemp, stood at the side of the Bearcat with their weapons, including AR-15s and other combat rifles, aimed at the front door.

78.  Undersheriff Munk agrees that the public would perceive the use of the Bearcat as an intrusive investigation.

79.  Undersheriff Munk "had no actionable intelligence" and did nothing to understand why State Police deployed the Bearcat.

80.  According to his own testimony, Undersheriff Munk had the authority to order State Police to remove the Bearcat from Valencia Village.

Exhibit A

81.   Undersheriff Munk exercised complete control over CCSO deputies on scene. As the highest ranking SSU officer, he also exercised complete control over the SSU operation.

82.   No officer had any information that anyone at #9 posed any threat to officer safety or the safety of others.

83.   The officers sought only to use the Bearcat in their joint operation to "shake[ ] the tree enough to get . . . the leads [they] need."

84.   One by one, Plaintiffs submitted to the officers' show of authority.

### *Rueben Olveda*

85.   Rueben turned 20 years-old on June 14, 2017.

86.   He invited his family over for a barbecue at his house to celebrate his birthday.

87.   He was grilling food and enjoying himself when he saw what looked like a SWAT team put a gun inside the window at space #2.

88.   Rueben went inside his house and peeked out the window but it looked like the officers and "the tank" they were driving were gone.

89.   He peeked out the back door and could not see anyone, but he heard people yelling.

90.   Rueben—aside from being a Hispanic male in Grants—looks nothing like the fugitive, Ramon Lorenzo.

91.   Rueben went to the front door and opened it to look outside and saw men in camouflage outfits aiming guns at him and ordering him on a loudspeaker to come out with his hands up.

92.   Officers forced Rueben to walk backwards down his steps at gunpoint and lift his shirt and spin around.

93.   Officers told Rueben to kneel down in the rocks, facing the trailer.

94.   Officers then made Rueben cross his feet and put his hands on top of his head.

95.     Rueben fully complied with all commands.

96.     Agent Beckford of the Tact Team handcuffed Rueben as neighbors peered out their windows and doors, watching the arrest.

97.     Agent Beckford locked Rueben in the back of a police car where Rueben sat handcuffed for over an hour in the heat, watching officers aim guns at his family members and place them in police cars.

98.     When officers would open the door to talk to Rueben, they made almost no effort to ask about Mr. Lorenzo.

99.     Officers ignored Rueben's repeated protests that he had not done anything wrong, that his family was just celebrating his birthday, and that the house was full of children, including his six-month-old daughter.

100.    An officer told Rueben that officers were just "checking every house [they] can think of in town."

101.    Rueben panicked and pleaded to be let out when he saw Grants Police Department ("GPD") Officer Armijo carrying away his baby, M.O., but officers ignored Rueben's pleas.

102.    Officers from all three agencies entered and searched Rueben's home without a warrant and without consent.

103.    CCSO deputies, including Deputy Kemp and at least two SSU officers, took the lead in making the warrantless search of Rueben's home.

104.    Deputy Kemp was the lead officer in the search.

105.    In the course of their search, officers opened silverware drawers and cabinets, turned over mattresses, and searched other areas where a human being could not possibly hide.

Exhibit A

106.    CCSO deputies on scene knew that Rueben was having a birthday party, and that it was "just a bunch of kids" in the house, but they continued to detain him because "you have to go through with the whole thing."

107.    Officers on scene determined that Rueben had no information about Mr. Lorenzo, but detained him anyway while the State Police and/or Sheriff's Lieutenant Hall ran him through NCIC to check him for warrants.

### *Joeleen Romero*

108.    Joeleen is Rueben's mother and M.O.'s grandmother.

109.    She watched as her son was arrested on his birthday for no reason by military-clad officers.

110.    She heard officers outside commanding everyone in the home to come out with their hands up.

111.    She was afraid that police were going to hurt the children, including her nine-year-old daughter, A.R., so she told the kids to lock the door behind her, and not to come out for any reason.

112.    Joeleen went outside with her hands up.

113.    Officers pointed "machine guns" at her and screamed at her to turn around and walk backwards toward them.

114.    Joeleen tried to look back because she couldn't see where she was going and the officers screamed at her again, threatening her.

115.    As instructed, she backed up and kneeled in the rocks in front of police and neighbors.

116.    She lifted her shirt and a male police officer searched her, touching her waist and underneath her breasts.

117.    Joeleen complied with all commands.

118.    Joeleen told officers that it was her son's birthday and "there are little kids inside," including her nine-year-old daughter.

119.    Officers screamed into the bullhorn: "KIDS! IN #9! COME OUT!"

120.    Undersheriff Munk shouted, "SHERIFF'S OFFICE! COME ON OUT! ADULTS IN THE TRAILER! SEND THE KIDS OUT!"

121.    Police dogs were barking and sirens were blaring in the street.

122.    Special Deputy Buhite wrote in his report that he saw Undersheriff Munk "staged and … trying to remove persons housed in a trailer" in Valencia Village.

123.    An officer handcuffed Joeleen for no reason.

124.    Officers locked Joeleen in a black truck.

125.    An unknown officer asked Joeleen a single question about Mr. Lorenzo.

126.    When Joeleen replied that she didn't know Mr. Lorenzo and that they were just celebrating a birthday, the officer took her name and left her in the backseat of the truck with the engine off and the windows up.

127.    Officers held Joeleen handcuffed in the back of the hot police truck and ignored her pleas to let her out.

128.    Joeleen watched officers seize everyone in the house at gunpoint.

129.    Joeleen saw her daughter, A.R., crying in the street.

130.    After spending about thirty minutes in the back of the truck, Joeleen saw police carrying away baby M.O., her granddaughter, and she "freaked out" and started shaking the inside of the truck and screaming at the top of her lungs.

131.    That finally got the attention of one of the fifteen to twenty officers at the scene.

Exhibit A

132.    He opened the door and told Joeleen that he would take her handcuffs off if she behaved herself.

133.    Officers eventually removed Joeleen's handcuffs and gave her baby M.O., but they left her locked in the back of the truck for the next thirty minutes.

134.    Officers on scene determined that Joeleen had done nothing wrong and had no information about Mr. Lorenzo, but detained her anyway while the State Police and/or Sheriff's Lieutenant Hall ran her through NCIC to check her for warrants.

### *Wayne Erice*

135.    Wayne, Rueben's step-father, followed Joeleen outside to see what was happening.

136.    He saw a "bunch of guys in tactical gear with guns pointing at him."

137.    Officers ordered Wayne to walk backward toward them and then get on his knees.

138.    At all times, Wayne fully complied with all commands.

139.    Officers searched Wayne and handcuffed him.

140.    When Wayne asked what was going on, officers said they would let him know.

141.    Officers knew at this point that the family was just celebrating a birthday, and did not ask Wayne a single question.

142.    CCSO Special Deputy Buhite locked Wayne in the back of his vehicle.

143.    Wayne was locked in the vehicle, handcuffed, for over an hour.

144.    Because Wayne is large in stature, the handcuffs were extremely painful.

145.    An unknown officer finally came to explain to Wayne that the reason everyone was being arrested was that "[p]eople didn't come out right away and that looks suspicious."

146.    The officer said to "pay attention next time" when police are in the neighborhood giving orders on the bullhorn.

16

Exhibit A

147.    Officers on scene determined that Wayne had done nothing wrong and had no information about Mr. Lorenzo, but detained him anyway while the State Police and/or Sheriff's Lieutenant Hall ran him through NCIC to check him for warrants.

### *Dominique Luna*

148.    Dominique, Rueben's cousin, was in a room with some of the younger kids who looked out the window and said that the adults were being handcuffed outside.

149.    The kids told her that they weren't supposed to open the door because Joeleen said not to.

150.    Everyone was terrified and didn't know what to do because the police were ordering them on the intercom to come outside.

151.    Eventually Dominique decided to go outside with her hands up when she heard officers commanding her to come out by name.

152.    Officers were crouching around a "big army truck," pointing guns at Dominique and screaming at her to raise her hands higher.

153.    Officers forced Dominique to walk backwards toward them.

154.    Officers put Dominique on her knees and searched under her shirt.

155.    Dominique fully complied with all of the officers' commands.

156.    Officers handcuffed Dominique and put her in the back of a hot truck for around an hour.

157.    It was hot and uncomfortable in the car.

158.    An unknown officer showed Dominique a single picture of Mr. Lorenzo, and when she told him she didn't know who that was, the officers left her alone and did not ask her any other questions except her name and date of birth.

159.    Dominique watched her whole family get arrested at gunpoint because "the cops were looking for some guy."

Exhibit A

160.    Dominique was furious when she saw officers handcuffing her thirteen-year-old sister, V.B.

161.    She was even angrier when she saw a police officer carrying away her six-month-old niece, M.O.

162.    Dominique did not want police to arrest her sister or take the baby, so she started screaming and kicking the car around to get their attention.

163.    "We haven't done anything wrong," she told an officer on scene. "You're handcuffing my little sister. She's twelve [expletive] years old!"

164.    The officer responded: "We have to keep the public safe."

165.    Officers on scene determined that Dominique had done nothing wrong and had no information about Mr. Lorenzo, but detained her anyway while the State Police and/or Sheriff's Lieutenant Hall ran her through NCIC to check her for warrants.

### *Brian Erice*

166.    Brian, Rueben's nineteen-year-old stepbrother, was with Rueben when they noticed police down the street.

167.    Rueben, Joeleen, and Wayne went outside and did not come back.

168.    One of Brian's younger cousins told him that the adults were being arrested and everyone got really scared.

169.    At first everyone stayed inside, but then they started going out one by one in compliance with the officers' commands.

170.    When Brian went outside, he saw an armored truck with machine guns pointed at him and police wearing SWAT gear and helmets and holding rifles.

171.    Brian fully complied with the officers' commands.

Exhibit A

172.    Officers forced Brian to lift up his shirt, and they handcuffed him behind his back, putting the handcuffs on very tight.

173.    An officer placed Brian in a vehicle and locked him in there for around hour.

174.    It was hot, but officers ignored Brian when he asked if they would roll down the window.

175.    Officers did not ask Brian any questions about Mr. Lorenzo.

176.    Officers on scene determined that Brian had done nothing wrong and had no information about Mr. Lorenzo, but detained him anyway while the State Police and/or Sheriff's Lieutenant Hall ran him through NCIC to check him for warrants.

### *George Olveda*

177.    George, Rueben's father, went outside to submit to the police when they called him outside by name.

178.    Officers pointed high powered rifles at George and ordered him to walk backward toward them with his hands up.

179.    At all times, George fully complied with the officers' commands.

180.    Officers put George on his knees and handcuffed him behind his back for no reason.

181.    Officers locked George in a vehicle belonging to a State Police officer where he was handcuffed next to his nephew, David, for about an hour.

182.    David was crying and scared.

183.    Officers did not ask George a single question.

184.    Officers did not even show George a picture of Mr. Lorenzo.

185.    Rueben's birthday party was obviously ruined and George felt that the family had been singled out for unjust treatment.

186.    Officers on scene determined that George had done nothing wrong and had no information about Mr. Lorenzo, but detained him anyway while the State Police and/or Sheriff's Lieutenant Hall ran him through NCIC to check him for warrants.

### *David Olveda*

187.    David, Rueben's nineteen-year-old cousin, was inside drinking a soda when the kids told him that family members were being arrested outside.

188.    David heard the police calling him on the intercom by name.

189.    When David went outside, he saw several officers in tactical gear pointing rifles at him.

190.    Officers held David at gunpoint and ordered him to walk backward to the sound of their voices, lift up his shirt, spin in a circle, and drop to his knees.

191.    At all times, David followed the officers' commands.

192.    Officers handcuffed David for no reason.

193.    Officers locked David in the back of a vehicle belonging to a State Police officer and held him there for around an hour in the heat.

194.    Officers did not ask David a single question except for his name and date of birth.

195.    Officers on scene determined that David had done nothing wrong and had no information about Mr. Lorenzo, but detained him anyway while the State Police and/or Sheriff's Lieutenant Hall ran him through NCIC to check him for warrants.

### *V.B.*

196.    When Rueben, Joeleen, and Wayne went outside, V.B., Rueben's thirteen-year-old cousin, went to the window with the other kids because they could hear the police outside screaming and nobody knew what was going on.

197.    Everyone stayed inside at first because Joeleen told them not to leave.

Exhibit A

198.    When others started going outside, V.B. initially stayed with the younger kids to comfort them.

199.    V.B. eventually went outside where officers held her at gunpoint.

200.    Officers ordered V.B. to walk backwards to the sound of their voices.

201.    Officers told V.B. to lift her shirt up in front of her family and neighbors and spin around as if she was carrying a weapon.

202.    V.B. complied with all of the officers' commands.

203.    Officers put V.B. on her knees, crossed her ankles, and then handcuffed her behind her back with metal handcuffs.

204.    By this point, CCSO Detective Chavez was so disgusted with the operation that he left the scene. He later testified:

> After a while I start seeing that they're starting to have people come out. At first people in the house were scared and didn't want to come out. There were kids. They were trying to yell out. There's kids in the house. We're having a birthday party. … By that time – and this is already like going into this thing – other officers were now arriving on scene. Okay? Reserve deputies, more state police officers. … They had way too many guys. And I don't – at this point here, I don't know what's going on with that situation, and that's all I'll say about that. … And so I checked out of the area.

205.    Officers kept tightening V.B.'s handcuffs.

206.    V.B. complained of pain in her wrists to no avail.

207.    An officer walked V.B. to his truck, lifted her shirt to expose her bra, looked at her exposed body and patted down her pockets.

208.    He assured her that the search would be recorded on video.

209.    There is no such video.

210.    V.B. was too small to reach the floorboards of the police truck, so the officer picked her up and threw her inside.

211.    V.B. landed on her side with her feet facing the door.

212.    The officer locked V.B. in the truck, handcuffed.

213.    Several officers came to the truck to speak with V.B.

214.    They knew that V.B. had no information about Mr. Lorenzo and they did not ask her a single question about him.

215.    Officers did, however, ask her whether she was from Mexico and if she had documentation allowing her to be in the United States.

216.    One officer told V.B. that she was detained so that they could investigate her immigration status.

217.    Another officer told her that they would "make things difficult for her" and they "do things [their] way" for officer safety and for the safety of the public.

218.    He asked V.B. if she was on probation.

219.    New Mexico State Police Agent Janice Madrid ("Agent Madrid") wrote in her report that it was "brought to [her] attention" that V.B. was "complaining of pain on her wrists from being handcuffed."

220.    Agent Madrid and Agent DeTavis temporarily removed the handcuffs for the sole purpose of photographing V.B.'s wrists.

221.    Officers knew that V.B. had done nothing wrong and posed no threat to anyone, conclusively determined that V.B. had to be released, but continued to detain her anyway so that officers could run her through NCIC.

222.    After what felt like hours in the back of a police car, V.B. was finally released.

223.    V.B. spent the night with her older sister, who was worried about her.

Exhibit A

224.    V.B. blamed her father, who was not even there, for "letting them get away with what they did" to her.

225.    V.B. has nightmares of being strip searched by male police officers.

226.    V.B. is angry that she was treated like a criminal and stereotyped.

227.    V.B. is depressed; she has mood disturbances; her grades dropped in the year following the incident; and she no longer is interested in playing softball.

228.    V.B. has been diagnosed with PTSD resulting from the incident, and she may require counseling for the rest of her life.

### *Samantha Chavez*

229.    Samantha lives with Rueben and is baby M.O.'s mother.

230.    Samantha was gone when police came to the house.

231.    She returned home at around 5:00 p.m. while the neighborhood was swarming with police.

232.    Officers blocked her from entering the cul-de-sac.

233.    Samantha saw children standing next to a police car looking for her and calling out for her, but the police wouldn't let them leave and they wouldn't let Samantha go to the children.

234.    Someone told Samantha that the police had her baby, and Samantha started "freaking out."

235.    Sheriff's Lieutenant Hall put Samantha in his vehicle.

236.    Sheriff's Lieutenant Hall wrote the following in his police report:

> At one point a young female came over to talk to me and she was very evasive. I told her if she did not talk to me I would take [her little brother] into protective Custody and turn him over to CYFD. I placed the young female into my back seat who identified herself as Samantha Chavez, the owner of the trailer.

237.    Samantha was not free to leave.

Exhibit A

238. A State Police officer asked Sheriff's Lieutenant Hall to release Samantha, but the lieutenant said he would not do so until a "guardian" came to pick up her little brother.

239. Sheriff's Lieutenant Hall ran Samantha through NCIC and checked her for warrants.

240. Sheriff's Lieutenant Hall did not ask Samantha anything about Mr. Lorenzo, but he wanted to know why she left her little siblings, A.C. and I.C., unattended.

241. This made no sense to Samantha because this was a birthday party and there were no less than seven adult family members with her siblings inside the house before officers showed up.

242. The only real threat to A.C. and I.C.'s safety was that posed by officers needlessly pointing guns at them and locking them in cars.

243. Officers, including Sheriff's Lieutenant Hall, got sidetracked and were not legitimately investigating the escape of Mr. Lorenzo.

244. Officers searched Samantha's effects within her home, without a warrant and without Samantha's consent.

245. Samantha was detained for no reason, and left wondering about the safety of her baby and the rest of her family for around thirty minutes.

## *I.C.*

246. I.C., Samantha's thirteen-year-old brother, followed V.B. out of the house.

247. I.C. had no idea who Mr. Lorenzo was and knew nothing about what the police were looking for.

248. He watched V.B. walk out into the yard and saw a line of SWAT officers pointing rifles at V.B., and at himself.

249. Officers ordered I.C. to get down to his knees next to V.B.

250. They went to handcuff him, but they had used the last pair of handcuffs on V.B.

251.    An officer went around asking for more handcuffs, but was not able to find any.

252.    I.C. waited for about two minutes on his knees while officers pointed guns at him.

253.    This was one of the scariest moments in I.C.'s life.

254.    Officers pulled I.C.'s wrists together behind his back with the backs of his hands pressed against each other, mimicking handcuffs.

255.    One officer wondered aloud why the police even wanted to detain thirteen-year-old I.C.: "Does he have a warrant?" the officer asked.

256.    I.C. was mostly worried about his cousin, V.B., and afraid for the safety of his little sister, A.C., who was still inside.

257.    He told an officer that there were only two little girls and a baby left inside, hoping that they wouldn't storm the house.

258.    Sheriff's Lieutenant Hall eventually put I.C. in his car.

259.    Sheriff's Lieutenant Hall showed I.C. a picture of a man.

260.    When I.C. said he didn't know who the picture was, Sheriff's Lieutenant Hall said I.C. would be sent to the juvenile detention center if he was lying.

261.    Sheriff's Lieutenant Hall wrote in his report that I.C. was a liar.

262.    Sheriff's Lieutenant Hall refused to release I.C. until his grandmother showed up even though there were several adult family members at Rueben's house.

263.    I.C. has avoided talking about the events that took place on June 14, 2017.

264.    I.C. now thinks police are just like any other people with guns.

265.    I.C. has since exhibited high levels of anxiety, poor sleep, nightmares, and hypervigilance.

266.    I.C. has been diagnosed with PTSD resulting from this incident and he will require counseling, family therapy, and psychological treatment for his injuries.

Exhibit A

***A.R.***

267.     A.R., age nine, was having fun with her cousins when police came to the house.

268.     A.R. thought "the army" had come because of the way officers were dressed.

269.     When the adults went outside, A.R. stayed inside with the other kids.

270.     She watched through the window as officers handcuffed her family members.

271.     A.R. hid with A.C. and M.O. behind a mattress in one of the bedrooms and cried.

272.     A.R. was crying because she didn't want to lose her family and she didn't want anyone to go to jail.

273.     Officers kept yelling for A.R. and A.C. to come out.

274.     When A.R. went outside, people wearing "army things" pointed their guns at her and then told her to stop crying and asked her where her mom was.

275.     Officers did not ask A.R. any other questions, except for her name and birthday.

276.     Officers walked A.R. to a hot police car where they locked her in with Joeleen and Dominique.

277.     It was so hot in the car that A.R. felt like she couldn't breathe.

278.     Joeleen and Dominique were shaking the car and screaming because a police officer was walking away with baby M.O.

279.     A.R. was locked in the hot car for around an hour.

280.     A.R. saw Agent DeTavis and Agent Madrid take the handcuffs off her cousin, V.B., but V.B.'s wrists were red all around, so it looked like red handcuffs were still on her.

281.     Before the police came everyone was having fun, and then it was ruined.

282.     A.R. usually doesn't think about the incident; she "tries to keep it to the side."

283.     A.R. doesn't like being by herself anymore; she can no longer play alone in her room.

Exhibit A

284. A.R. has recurring nightmares about the police.

285. A.R.'s grades in school plummeted after the raid.

286. A.R. has shown signs of trauma, poor sleep, nightmares, hypervigilance, and she expresses fear and panic around law enforcement.

287. A.R. has been diagnosed with PTSD resulting from this incident and will require counseling, family therapy, and psychological treatment for her injuries.

### *A.C.*

288. Eleven-year-old A.C., Samantha's little sister, was sitting around talking with A.R. when they heard that police were outside.

289. Everyone started going outside one by one.

290. A.C. went to the bathroom window to see what was happening.

291. She saw officers handcuffing her family members and aiming guns at them.

292. A.C. saw her brother kneeling at gunpoint in the dirt and she wondered if he would live or die.

293. Deputy Kemp, the SSU officers, and others, approached the house.

294. A.C. heard officers yelling in the doorway and hitting the door.

295. Since A.C. was the oldest child inside, she felt responsible to protect baby M.O. from the intruders.

296. A.C. picked the baby up and went to the door.

297. When A.C. opened the door, there were four or five guns pointed at her.

298. A person in what looked like a "black welding mask" pointed a gun at her and the baby.

299. Officers asked A.C., a child carrying a baby, if she had any weapons.

300. A.C. couldn't speak.

301.    A.C. thought officers were going to hurt M.O., so she clutched her tight.

302.    She wanted to ask what happened to her family but she couldn't get the words out.

303.    Officers told A.C. to "give [them] the baby."

304.    GPD Officer Armijo took baby M.O. out of A.C.'s arms and walked away with her.

305.    CCSO officers, led by Deputy Kemp, rushed into the home behind A.C. to search it without a warrant and without consent.

306.    Officers walked A.C. to the middle of the cul-de-sac, next to A.R., and then eventually put them both in the cab of the police truck with Joeleen and Dominique.

307.    A.C. was detained for around an hour.

308.    A.C. couldn't sleep that night.

309.    A.C. and I.C. stayed up with their grandmother all night on couches in the living room.

310.    A.C. cries when she talks about what happened.

311.    A.C. has flashbacks of men pointing guns at her.

312.    When she thinks about it, it scares her.

313.    A.C. is afraid of the police.

314.    A.C. wonders if the intruders are coming back for her family.

315.    A.C., a resilient child, now experiences emerging anxieties and is easily stressed.

316.    A.C. has been diagnosed with PTSD resulting from this incident and she will require counseling into the future.

### *M.O.*

317.    M.O. was six months old when police raided her home.

318.    M.O. heard sirens, police dogs barking, and officers giving commands through a bullhorn.

319.    M.O. saw everyone she cares about distressed, crying, and scared.

320.    M.O. was forcibly separated from her family by the police.

321.    M.O. was taken from A.C.'s arms at gunpoint.

322.    M.O. has been diagnosed with sleep terrors and pre-verbal trauma resulting from the incident and she will require counseling, family therapy, and psychological treatment.

### *After the Invasion*

323.    Officers continued to lock-down the City of Grants but did not locate Mr. Lorenzo, who was hiding in the closet of a separate home, for the next five days.

324.    CCSO officers minimized the incident at Valencia Village, pretended they were never there, or didn't write a police report at all.

325.    Upon information and belief, CCSO officers destroyed video and audio recorded at the scene.

326.    Deputy Kemp has never acknowledged that he entered Rueben's home.

327.    Deputy Reyes Veloz has never acknowledged that he participated in the raid.

328.    Deputy Kimery Ward has never acknowledged that he participated in the raid.

329.    Upon information and belief, Undersheriff Munk and Deputy Kemp minimized the extent to which they were involved in what occurred at Valencia Village.

330.    Upon information and belief, other CCSO deputies were on scene and did not file police reports, or those reports were never produced in response to a public records request and a subpoena.

331.    On June 21, 2017, Plaintiffs made a public records request to CCSO, requesting all video and audio recordings and any police reports related to "the detention or questioning of any person at … Valencia Village, Lot #9" or anywhere else in Valencia Village on June 14, 2017. (**Exhibit 1**)

332.    On June 22, 2017, Plaintiffs received a response from the County's recording and filing clerk, stating that "due to the amount of information requested," the County would need until July 3, 2017, to respond.

333.    Despite the apparently voluminous "amount of information requested," the County's chief deputy clerk eventually sent a total of "3 statements from 3 officers concerning" Plaintiffs' request for records.

334.    The statements came with a letter written and signed by Sheriff Mace, which stated:

To. Insima Padilla - Legal Secretary

Reference. IPRA concerning Ruben Olveda, Jolene Romero.

In response to your IPRA request I have attached copies of statements from the three officers that were on scene at space number 9 Valencia Village on June 14, 2017 there are neither photos nor video recordings. The three deputies on scene did not interview anybody nor speak to anybody they never made entry into the residence they were perimeter security outside the residence. They were only assisting the New Mexico State Police Tact Team. Should you have any other questions or need assistance feel free to contact me.

Sheriff Tony Mace
Cibola County Sheriff's Office
700 E Roosevelt Suite 50 Grants NM 87020 505-876-2040
tnymace@yahoo.com

335.    On February 9, 2018, Plaintiffs served a subpoena on the County in a separate lawsuit.

336.    On March 27, 2018, Plaintiffs received responsive police reports that were never produced in response to their public records request.

337.    From the reports, Plaintiffs learned that CCSO officers, specifically Deputy Kemp and Undersheriff Munk, caused the invasion of Spaces #8 and #9.

338.    Plaintiffs learned that CCSO officers led the raid of Rueben's home.

339.    Plaintiffs learned that CCSO officers entered Rueben's home without a warrant.

340.    Plaintiffs learned that CCSO officers detained Rueben's family members in their vehicles.

341.    Plaintiffs learned that CCSO officers questioned Rueben's family members and ran them through NCIC.

Exhibit A

342.   Plaintiffs learned that CCSO officers pointed their guns at Rueben's family members, including children.

343.   To this day, Plaintiffs have not received any supplemental response from Sheriff Mace or any County records custodian to their IPRA request.

### COUNT I: FALSE ARREST, FALSE IMPRISONMENT AND UNLAWFUL SEIZURES IN VIOLATION OF THE TORT CLAIMS ACT AND THE NEW MEXICO CONSTITUTION

### (*Undersheriff Munk and CCSO*)

344.   Plaintiffs incorporate all allegations as if fully stated herein.

345.   Article II, Section 10 of the New Mexico Constitution provides more comprehensive protection than its federal counterpart, the Fourth Amendment.

346.   Pursuant to NMSA 1978, Section 41-4-12, the Cibola County Board of Commissioners is vicariously liable for the conduct of CCSO officers when that conduct results in personal or bodily injury caused by assault, battery, false arrest, false imprisonment or the deprivation of rights secured by Article II, Section 10 of the New Mexico Constitution.

347.   CCSO officers acted in concert with other agencies on scene to violate Plaintiffs' constitutional rights and/or caused others to do so.

348.   CCSO through Undersheriff Munk had authority over the scene at Valencia Village, including the ability to order NMSP officers and the Bearcat to leave the subdivision.

349.   Plaintiffs submitted to the officers' show of authority and were falsely arrested, falsely imprisoned and seized within the meaning of the Tort Claims Act and Article II, Section 10 of the New Mexico Constitution.

350.   CCSO officers did not have probable cause or a warrant, both of which are required to order a person out of his home.

Exhibit A

351.   Each seizure was a highly intrusive encounter involving:

    a.   the physical separation of family members;

    b.   the use of the bullhorn;

    c.   the use and/or display of military equipment, handcuffs, and firearms;

    d.   the use and/or display of the Bearcat;

    e.   the prolonged detention of Plaintiffs in the backs of hot police cars;

    f.   in all cases except for Samantha, the use of assault weapons to hold each Plaintiff at gunpoint;

    g.   in all cases except for Samantha, the forced removal of each Plaintiff from the private space of the home;

    h.   in all cases, except for Samantha and baby M.O., a search of each Plaintiff's body or clothing; and

    i.   in all cases except for Samantha, baby M.O., I.C. and A.C., and A.R., the use of handcuffs for a prolonged period of time.

352.   The seizure of every Plaintiff constituted an arrest.

353.   The police lacked probable cause for each arrest:

    a.   Officers engaged in an unparticularized manhunt.

    b.   Officers had no reason to suspect that criminal activity was afoot in Rueben's home.

    c.   Movement in a home does not justify a militarized invasion.

354.   The police also lacked reasonable suspicion to detain each Plaintiff:

    a.   An individual's presence in an area of suspected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.

Exhibit A

b.  General profiles that fit large numbers of innocent people do not establish reasonable suspicion.

c.  Law enforcement cannot detain people on a hunch.

d.  There was no particularized suspicion that any Plaintiff was involved in any crime.

e.  There was no particularized suspicion that any Plaintiff would destroy evidence of any crime.

f.  There was no particularized suspicion that any Plaintiff posed any threat to officer safety or the safety of others.

g.  There was no particularized suspicion that any Plaintiff had any information about the escapee, Mr. Lorenzo.

355.  Officers did not conduct an adequate pre-arrest/detention investigation:

a.  Officers had no cause or exigency that required them to rush to force Plaintiffs out of the home for warrantless arrest.

b.  Plaintiffs' home and neighborhood was completely surrounded by law enforcement, and nothing (except the absence of probable cause) precluded the police from seeking a warrant.

c.  Officers did not interview neighbors or witnesses about any suspected criminal activity or alleged threat posed at space #9 prior to seizing Plaintiffs.

d.  Officers made no effort to determine who lived at space #9 or explore any possible connections to Mr. Lorenzo.

e.  Officers did not even knock at the door.

356.  If there was ever any cause to seize any Plaintiff, it evaporated, or the seizure was unduly prolonged:

Exhibit A

a.  Officers unreasonably ignored basic exculpatory evidence that Plaintiffs were "moving around" because they were looking out the window at SWAT action and a Bearcat in their neighborhood.

b.  Officers ignored each Plaintiff's full compliance with their unlawful commands and ignored the manifest fact that no Plaintiff posed any physical threat.

c.  Officers ignored Plaintiffs' honest explanation that they did not know Mr. Lorenzo.

d.  Officers were subjectively aware that any reason for the continued seizure dissipated.

e.  Officers prolonged each seizure to make unrelated investigations, checking for warrants and asking questions about citizenship and guardianship.

f.  Officers made a conscious choice to hold Samantha and I.C. in custody after they knew that they had no lawful justification for doing so.

357.  CCSO officers, including Undersheriff Munk, Deputy Kemp, unidentified SSU officers, special reserve deputies on scene, Sheriff's Lieutenant Hall, and others, caused each Plaintiff damages.

358.  Each violation of each Plaintiff's rights constitutes a separate occurrence within the meaning of the Tort Claims Act's cap on damages.

## COUNT II: ASSAULT, BATTERY, AND EXCESSIVE FORCE IN VIOLATION OF THE TORT CLAIMS ACT AND THE NEW MEXICO CONSTITUTION

### (*Undersheriff Munk and CCSO*)

359.  Plaintiffs incorporate all allegations as if fully stated herein.

360.  CCSO officers committed assaults, batteries, and constitutional violations against Plaintiffs and caused others to do so.

361.  CCSO officers acted in concert with other agencies on scene to violate Plaintiffs' constitutional rights and/or caused others to do so.

34

Exhibit A

362.   CCSO through Undersheriff Munk had authority over the scene at Valencia Village, including the ability to order NMSP officers and the Bearcat to leave the subdivision.

363.   The degree of forced use was unlawful.

364.   For example:

    a.   Officers operated with animus, hostility, and belligerence.

    b.   Officers unreasonably deployed a SWAT team to investigate movement in a home.

    c.   Officers unreasonably used the Bearcat to cow law-abiding citizens into submission.

    d.   Officers aimed assault weapons at adults and children who they were prepared to kill.

    e.   Officers aimed a rifle at a six-month-old baby.

    f.   Officers forced Plaintiffs to kneel in hot rocks.

    g.   Officers forced Plaintiffs, including children, to lift their shirts in front of neighbors for inspection.

    h.   Officers handcuffed non-suspects, including a thirteen-year-old girl.

    i.   Officers separated a baby from her father, mother, and grandmother, and pulled the baby out of a child's arms.

    j.   Officers locked every Plaintiff in hot police cars and refused to let them out for an unnecessarily prolonged period of time.

    k.   The officers' conduct was emotionally scarring.

    l.   Officers humiliated Plaintiffs, who were non-suspects in the investigation, and exhibited no concern for their personal security and dignity interests.

365.   Plaintiffs fully complied with all of the officers' commands and were subjected to prolonged, unwarranted force anyway.

366.   Officers had no reason to believe that any Plaintiff would interfere with the search of

Exhibit A

Rueben's home if not locked inside a police car.

367.   Officers could not have reasonably believed that weapons were necessary for their protection when they were ordering children out of space #9, one by one.

368.   All officers were in the immediate area on scene, and any individual CCSO officer who did not actually participate in the use of excessive force is liable for his nonfeasance in failing to take reasonable steps to protect Plaintiffs from other officers' use of force.

369.   CCSO officers caused each Plaintiff damages.

370.   Plaintiffs' injuries are real and not de minimis.

371.   Each violation of each Plaintiff's rights constitutes a separate occurrence within the meaning of the Tort Claims Act's cap on damages.

**COUNTS III-IV: STATE LAW NEGLIGENCE LEADING TO ASSAULT, FALSE ARREST, FALSE IMPRISONMENT, BATTERY, VIOLATION OF PROPERTY RIGHTS AND/OR STATE CONSTITUTIONAL VIOLATIONS**

**(*CCSO*)**

372.   Plaintiffs incorporate all allegations as if fully stated herein.

373.   NMSA 1978, Section 41-4-12 subjects to liability all law enforcement officers and their employers for negligence that results in assault, false arrest, false imprisonment, battery, violation of property rights and/or state constitutional violations.

374.   COUNT III: CCSO officers were negligent in unreasonably militarizing their response to Mr. Lorenzo's escape from jail and in permitting other agencies to do so.

    a.   CCSO should have known that a militarized deployment in the City of Grants and in Valencia Village to investigate non-suspects would result in excessive force.

    b.   CCSO should have anticipated widespread tort and constitutional violations, including the violations that occurred at space #9.

c.  CCSO officers were negligent.

375.  <u>COUNT IV</u>: CCSO, including supervisors, have been aware since *Fogarty v. Gonzales*, 523 F.3d 1147 (10th Cir. 2008) that employees of law enforcement agencies can avoid liability for unlawful arrests, excessive force, and state law torts if they do not file police reports, identify themselves, activate their recording devices, or document their involvement at the scene.

    a.  CCSO should have known that failing to create, enforce, and train on policies requiring accurate reporting for arrests at gunpoint would lead to widespread constitutional violations, including the violations that occurred at space #9.

    b.  CCSO should have known that their negligent training and supervision created an atmosphere where law enforcement officers could detain people at gunpoint without reasonable suspicion, or arrest them without probable cause, and that they were emboldened to do so without fear of being held accountable.

376.  The above-stated negligence in COUNTS III and IV resulted in the assault, false arrest, false imprisonment, battery, and violation of property rights of Plaintiffs.

377.  The above-stated negligence in COUNTS III and IV is the moving force behind the deprivation of Plaintiffs' rights secured by Article II, Section 10 and Article II, Section 18 of the New Mexico Constitution, as described above.

378.  CCSO officers caused bodily and personal injuries to each Plaintiff.

379.  Each violation of each Plaintiff's rights constitutes a separate occurrence within the meaning of the Tort Claims Act's cap on damages.

## COUNT V: INSPECTION OF PUBLIC RECORDS

### (*CCSO and Sheriff Mace*)

380.  Plaintiffs incorporate all allegations as if fully stated herein.

381.    The public is entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees.

382.    When no exemption is claimed by a public body, "[e]very person has a right to inspect public records of this state[.]" NMSA 1978, § 14-2-1 (2011).

383.    The Legislature commands not only access to public records, but *timely* access.

384.    "A custodian receiving a written request shall permit the inspection immediately or as soon as is practicable under the circumstances, but not later than fifteen days after receiving a written request." NMSA 1978, § 14-2-8(D) (2009).

385.    "If the inspection is not permitted within three business days, the custodian shall explain in writing when the records will be available for inspection or when the public body will respond to the request." *Id.*

386.    "Section 14-2-11 ensures prompt compliance by allowing for statutory damages of up to $100 per day if a public body fails to timely respond to a records request." *Faber v. King*, 2011-NMSC-015, ¶ 31, 248 P.3d 173.

387.    Damages shall "be awarded if the failure to provide a timely explanation of denial is determined to be unreasonable." § 14-2-11(C).

388.    Damages for untimely compliance shall "not exceed $100 per day" and shall accrue from the day the public body is in noncompliance until a written denial is issued. *Id.*

389.    Additionally, when a written request for records is not permitted within fifteen days of receipt, the request "may be deemed denied[,]" permitting a requestor to pursue all remedies provided in IPRA. § 14-2-12(A).

390.    "The court shall award damages, costs and reasonable attorneys' fees to any person whose written request has been denied and is successful in a court action to enforce the provisions of

[IPRA]." § 14-2-12(B).

391.    Thus, "when a public body provides an incomplete or inadequate response to a request to inspect public records, that body is not in compliance with IPRA[,]" *Britton v. Office of Attorney General*, A-1-CA-35346, ¶ 33, 2018 WL 4575176 (September 24, 2018), and is subject to damages of up to $100 per day, plus costs, actual damages, and reasonable attorney's fees, *id.* ¶ 36.

392.    Defendants did not produce critical public records, including, among other things, Sheriff Lieutenant Hall's police report, Special Deputy Bohite's police report, or Special Deputy Sabroe's police report.

393.    Sheriff Tony Mace affirmatively represented to Plaintiffs that no CCSO officer entered a private residence or land or spoke with or interviewed anyone in Valencia Village.

394.    Sheriff Tony Mace lied about that.

395.    Plaintiffs still do not know whether other public records are being withheld.

396.    Defendants willfully failed to comply with Section 14-2-11 and have still not supplemented their response to Plaintiffs' IPRA request.

397.    The IPRA violation has caused or may still cause actual damages.

### COUNT VI: 42 U.S.C. § 1983: UNREASONABLE SEIZURES

### (*Undersheriff Munk*)

398.    Plaintiffs incorporate all allegations as if fully stated herein.

399.    Non-particularized manhunts have been universally condemned by the federal courts.

400.    The particularity requirement of the Fourth Amendment's Warrant Clause ensures that searches and seizures will be carefully tailored to their justifications and will not permit wide-ranging explorations.

401.    It is clearly established that the Fourth Amendment's foremost concern is the home.

Exhibit A

Warrantless searches and seizures in the home are presumptively unreasonable.

402.    Absent exigent circumstances, police may not enter an individual's home to make a warrantless felony arrest even if probable cause to arrest the individual exists. *Payton v. New York*, 445 U.S. 573, 576 (1980)

403.    The warrant requirement applies to all seizures in the home. There is no such thing as an investigative detention within the home. It is clearly established that any attempt to label a seizure within the home as an investigative detention to thwart the warrant requirement is "of no consequence." *Manzanares v. Higdon*, 575 F.3d 1134, 1144 (10th Cir. 2009). "[T]hat distinction does not matter in an individual's own home." *Storey v. Taylor*, 696 F.3d 987, 993-94 (10th Cir. 2012).

404.    It is clearly established that officers need not physically enter the home for *Payton* to apply. *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008). Rather, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *Id.* When officers position themselves outside a home and ask a person to come outside, the Tenth Circuit considers whether the person "opened the door as a result of coercive police conduct." *Id.* at 1167. Leaving the home is not voluntary if ordered to do so under color of authority. *Id.*

405.    Undersheriff Munk did not have probable cause to order Plaintiffs out of the home.

406.    Undersheriff Munk did not have a warrant to order Plaintiffs out of the home.

407.    No emergency required Undersheriff Munk to order Plaintiffs out of the home without a warrant.

408.    Undersheriff Munk did not conduct an adequate pre-arrest investigation.

409.    Undersheriff Munk continued to seize and supervise the seizure of Plaintiffs, including

Exhibit A

several children, even after any suspicion whatsoever dissipated.

410.     Undersheriff Munk oversaw a joint operation with other agencies.

411.     Undersheriff Munk had the authority to stop the intrusion into Reuben's home and the arrest of all Plaintiffs but instead participated in the raid.

412.     Undersheriff Munk was aware that his deputies, SSU agents, and state police agents under his control were conducting warrantless searches and seizures in violation of the Fourth Amendment, but nevertheless permitted them to do so, exposing him to liability as a supervisor. *See Castro v. Cty. Of Bernalillo*, No. CIV 15-521 JAP/SCY, 2015 WL 13659236, at *7 (D.N.M. Aug. 27, 2015).

413.     Undersheriff Munk caused damages to all Plaintiffs.

## COUNT VII: 42 U.S.C. § 1983: EXCESSIVE FORCE

### (*Undersheriff Munk*)

414.     Plaintiffs incorporate all allegations as if fully stated herein.

415.     The display of weapons, the pointing of firearms directly at persons and the use of the Bearcat inescapably involves the immediate threat of deadly force. It is excessive to aim a loaded firearm at a person who has already submitted to a show of authority. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001).

416.     It is excessive to allow a militarized vehicle (Bearcat) to park in front of a home and between houses.

417.     Pointing firearms at children calls for even greater sensitivity. *Id.*

418.     Officers are required to articulate specific justifications for each use of force, "such as locking a person in a car." *Maresca v. Bernalillo County*, 804 F.3d 1301, 1313 (10th Cir. 2015).

419.     "[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone

absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion." *Manzanares*, 575 F.3d at 1150.

420.    It is clearly established that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983. *Maresca*, 804 F.3d at 1314.

421.    Undersheriff Munk used excessive force and/or failed to intervene to prevent the use of excessive force against all Plaintiffs.

422.    Undersheriff Munk caused damages to all Plaintiffs.

## SUPERVISORY LIABILITY AND MUNICIPAL LIABILITY EXCESSIVE FORCE AND UNREASONABLE SEIZURES ALLEGATIONS AS TO ALL FEDERAL COUNTS

### (*Undersheriff Munk and CCSO*)

423.    Undersheriff Munk was personally involved in the violation of Plaintiffs' clearly established constitutional rights by permitting excessive force, directly participating on-scene, and by staging himself to remove Plaintiffs from Reuben's home.

424.    Undersheriff Munk was personally involved in SSU training and policymaking that led to Fourth Amendment violations in this case.

425.    Undersheriff Munk had authority over the joint operation.

426.    The policy of Munk and CCSO were the moving force behind the deprivation of Plaintiffs' rights.

427.    Munk was and is the policymaker for decisions related to when it is appropriate and lawful to call forth SWAT for extraction of citizens from their homes.

428.    Undersheriff Munk permitted officers on scene to aim firearms at compliant persons, including children, to handcuff V.B., a child, and to lock Plaintiffs in the backs of hot police cars for no apparent reason.

Exhibit A

429.    Undersheriff Munk permitted the SSU officers, state police agents, and the Bearcat to remain on scene, though he knew or should have known that their militarized presence would deprive Plaintiffs of their clearly established constitutional rights.

430.    Undersheriff Munk was deliberately indifferent to the violation of Plaintiffs' clearly established constitutional rights.

431.    Undersheriff Munk's deliberate indifference caused damages to all Plaintiffs.

<b><u>REQUEST FOR RELIEF</u></b>

**WHEREFORE**, Plaintiffs seek the following relief:

   I.    Actual and compensatory damages sufficient to make them whole against Defendants;

  II.    Punitive damages as to Undersheriff Munk;

 III.    Costs, expenses, pre- and post-judgment interest as provided by law;

 IV.    $100 per day for each day public records related to this case have been and/or continue to be withheld;

  V.    An order requiring the production of responsive records;

 VI.    Reasonable attorneys' fees; and

VII.    Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**KENNEDY KENNEDY & IVES, PC**

*/s/ Adam C. Flores*
Adam C. Flores
Joseph P. Kennedy
Shannon L. Kennedy
1000 2nd Street NW
Albuquerque, New Mexico 87102
505-244-1400 / Fax (505) 244-1406

*Attorneys for Plaintiffs*

Exhibit A

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served upon all parties of record on the day of its filing via the Odyssey electronic filing system.

**_/s/ Adam C. Flores_**
Adam C. Flores

Exhibit A